4:05-cv-334
4:05-cv-333
4:05-cv-332

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

# FILED
October 13, 2008

No. 07-10952

Charles R. Fulbruge III
Clerk

U.S. DISTRICT COURT
**NORTHERN DISTRICT OF TEXAS**
FILED

NOV 2 1 2008

CLERK, U.S. DISTRICT COURT
By _____
Deputy

JOSEPH HOPKINS; COLLECTIVE ACTION MEMBERS

> Plaintiffs - Appellees-Cross-Appellants

v.

CORNERSTONE AMERICA; MID-WEST NATIONAL LIFE INSURANCE
COMPANY OF TENNESSEE; UNITED INSURANCE COMPANIES INC

> Defendants - Appellants-Cross-Appellees

---

SHERRIE BLAIR; ANDREW BOWMAN; CHRIS FOX; BOB HOWELL;
MARK MANN; COLLECTIVE ACTION MEMBERS

> Plaintiffs - Appellees-Cross-Appellants

v.

CORNERSTONE AMERICA; MID-WEST NATIONAL LIFE INSURANCE
COMPANY OF TENNESSEE; UNITED INSURANCE COMPANIES INC

> Defendants - Appellants-Cross-Appellees

---

NORM CAMPBELL; MARK CROUCHER; JEFF GESSNER; TERRENCE
JOHANESEN; DONNIE KLEIN; SCOTT ROUGHEN; STEVE WOODHEAD;
DAVID YOUNG; COLLECTIVE ACTION MEMBERS

> Plaintiffs - Appellees-Cross-Appellants

v.

No. 07-10952

CORNERSTONE AMERICA; MID-WEST NATIONAL LIFE INSURANCE
COMPANY OF TENNESSEE; UNITED INSURANCE COMPANIES INC

Defendants - Appellants-Cross-Appellees

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before GARZA and ELROD, Circuit Judges, and HICKS,[*] District Judge.

EMILIO M. GARZA, Circuit Judge:

Fourteen former sales leaders ("Sales Leaders") of defendant Cornerstone America ("Cornerstone") filed suit for unpaid overtime wages under the Fair Labor Standards Act ("FLSA"). The federal district court granted summary judgment in favor of the Sales Leaders on the threshold issue of whether the Sales Leaders were employees or independent contractors under the FLSA. Cornerstone now appeals this ruling. The Sales Leaders cross-appeal, alleging that the district court erred in dismissing the claims of one of their members, Chris Fox ("Fox"), on the grounds of judicial estoppel. For the following reasons, we affirm in part and vacate in part.

**I**

Cornerstone is the sales and marketing division of defendant Mid-West National Life Insurance Company of Tennessee ("Mid-West"), a corporation that issues and sells health insurance policies. Cornerstone uses a pyramid system of approximately 1,200 sales agents, each of whom agrees to work as an

_____

[*] District Judge of the Western District of Louisiana, sitting by designation.

independent contractor on a commission basis. Some of these agents are subsequently promoted to the position of "sales leader," a management-level position in the Cornerstone hierarchy.

By contract, sales leaders agree to remain as independent contractors when they are elevated from the position of sales agent by Cornerstone. However, their opportunity to engage in personal sales diminishes, and they become primarily responsible for recruiting, training, and managing a team of subordinate sales agents.   As the leaders progress in their careers, their primary income derives from overwrite commissions on their subordinates' sales. Despite this economic dependency, there is no formal relationship between the sales leaders and their team members. Each subordinate agent contracts directly with Cornerstone, and Cornerstone alone controls the hiring, firing, assignment, and promotion of the agents in each leader's team. Cornerstone also unilaterally determines the sales leaders' territories, and prevents the sales leaders from selling other insurance products or operating other businesses.   Finally, Cornerstone controls the distribution of sales leads—the "lifeblood" of the business model—and prohibits sales leaders from purchasing leads from outside sources.

Despite this fairly rigid structure, sales leaders possess a great deal of flexibility with regard to their hours and day-to-day affairs. They receive no employment benefits, and Cornerstone withholds no wages for tax purposes. According to Cornerstone, corporate oversight is minimal, and the sales leaders' attendance at Cornerstone meetings and training sessions is generally considered optional.

The plaintiff-Sales Leaders in this case are all former sales leaders of Cornerstone—four were district sales leaders, nine were regional sales leaders, and one was an area sales leader. They filed suit against Cornerstone and its parent companies in federal district court, alleging that they were entitled to

3

unpaid overtime wages as employees under the FLSA. Because the FLSA applies to employees but not to independent contractors, the district court initially sought to determine the employment status of the Sales Leaders. After both sides submitted summary judgment motions, the court ruled in favor of employee status for all of the Sales Leaders (except Chris Fox), allowing them to proceed with their FLSA claims. As to Fox alone, the district court concluded that judicial estoppel barred him from asserting employee status because he had previously claimed to be an independent contractor in an unrelated lawsuit.

After the district court issued its summary judgment order, Cornerstone sought permission to file an interlocutory appeal on the FLSA issue. *See* 28 U.S.C. § 1292(b) (permitting interlocutory appeal of "controlling question[s] of law as to which there is substantial ground for difference of opinion"). The district court granted permission to appeal and certified the following question for our review: "Whether, under the undisputed facts, Plaintiffs are employees of Defendants or independent contractors under the FLSA." After Cornerstone petitioned this Court for permission to appeal on the certified question, the Sales Leaders petitioned for permission to cross-appeal solely on the estoppel ruling against Fox. We granted both petitions.[1]

## II

Cornerstone contends that the district court erred in concluding that the Sales Leaders were employees under the FLSA. We review *de novo* a district court's legal conclusion as to employment status in a grant of summary

---

[1] There was some debate in the briefing over whether we had jurisdiction to hear the estoppel-issue cross-appeal. When a district court identifies a particular "controlling question of law" from its order for interlocutory review, we have discretion to address *any issue* contained in the original order. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996). Because we granted the Sales Leaders' petition for permission to cross-appeal, which only raised the estoppel issue, we believe it appropriate to exercise our discretionary review on the matter.

judgment. *Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 332 (5th Cir. 1993). Given the limited scope of the certified question, we consider only the undisputed facts.

The definition of employee under the FLSA is particularly broad. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (noting that the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles"). To determine if a worker qualifies as an employee, we focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself. *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998). To aid us in this inquiry, we consider five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Id.* No single factor is determinative. *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043–44 (5th Cir. 1987). Rather, each factor is a tool used to gauge the *economic dependence* of the alleged employee, and each must be applied with this ultimate concept in mind. *Id.*

## A.

Under our economic-realities approach, "[c]ontrol is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Mr. W Fireworks*, 814 F.2d at 1049. "[T]he lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Id.* Cornerstone contends that the control factor weighs in favor of independent-contractor status

because the Sales Leaders possessed independence in their day-to-day affairs and because Cornerstone exerted little control beyond what insurance-industry regulations required.

After a review of the record, we are convinced that Cornerstone controlled the "meaningful" economic aspects of the business. *See Mr. W Fireworks*, 814 F.2d at 1049. First, Cornerstone controlled the hiring, firing, assignment, and promotion of the Sales Leaders' subordinate agents. Because most of the Sales Leaders relied on overwrite commissions as their primary source of income, the Sales Leaders' lack of control over personnel decisions is significant. Second, Cornerstone at least partially controlled the advertising for new recruits by providing the Sales Leaders with approved ads and monitoring their placement. Third, Cornerstone exclusively determined the type and price of insurance products that the Sales Leaders could sell. As Cornerstone's corporate representative acknowledged, "one of the tenets" of Cornerstone's business was that leaders could not sell competing products if they wanted to "receive leads" and "have their compensation advanced." Fourth, Cornerstone controlled the number of sales leads the Sales Leaders would receive, and prevented the Sales Leaders from purchasing leads from other sources. Finally, Cornerstone determined the geographic territories where the Sales Leaders and their subordinates could operate.

Because Cornerstone controlled the meaningful aspects of the business model such that the Sales Leaders could not plausibly be considered "separate economic entit[ies]," *see Mr. W Fireworks*, 814 F.2.d at 1049, we conclude that the control factor weighs in favor of the Sales Leaders' employee status.

## B.

In applying the relative-investment factor, we compare each worker's *individual* investment to that of the alleged employer. *See Herman*, 161 F.3d at

304 (declining to aggregate the alleged employees' investments). Here, it is clear that Cornerstone's investment—including maintaining corporate offices, printing brochures and contracts, providing accounting services, and developing and underwriting insurance products—outweighs the personal investment of any one Sales Leader. Cornerstone does not dispute this, but argues that the Sales Leaders made "substantial investments" in their individual offices. While this may be true, Cornerstone's greater overall investment in the business scheme convinces us that the relative-investment factor weighs in favor of employee status. *See id.*

## C.

We next consider whether the worker or the alleged employer controlled the "major determinants of the amount of profit which the [worker] could make." *See Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1313 (5th Cir. 1976). Cornerstone contends that the Sales Leaders primarily determined their own profit through recruiting new agents, controlling office costs, and motivating subordinates. We disagree.

The major determinants of the Sales Leaders' profit or loss were controlled almost exclusively by Cornerstone. Cornerstone controlled the hiring, firing, and assignment of subordinate agents, and thus effectively regulated overwrite commissions—the Sales Leaders' primary source of income. Cornerstone controlled the distribution of sales leads, and restricted the Sales Leaders from selling competing products. Cornerstone unilaterally defined the Sales Leaders' territories, and Cornerstone could (and did) assign competing sales leaders within these territories. Finally, Cornerstone prevented the Sales Leaders from owning and operating other businesses.

Our decision in *Hickey v. Arkla Industries, Inc.* provides an instructive comparison. 699 F.2d 748 (5th Cir. 1983) (applying the economic-realities test

No. 07-10952

in an ADEA case).  In *Hickey*, we determined that a gas-products salesman was an independent contractor because his profit hinged on his ability to increase customer volume through initiative and skill. *Id.* at 752. We also noted that the salesman could sell competitors' products. *Id.* By contrast, the Sales Leaders are restricted from selling other insurance products, and their customer volume hinges on Cornerstone's distribution of leads and assignment of subordinate salesmen. Thus, the opportunity-for-profit factor weighs in favor of employee status.

### D.

We also consider whether the worker exhibits the type of skill and initiative typically indicative of independent-contractor status. *See Pilgrim Equip.*, 527 F.2d at 1314 ("Routine work which requires industry and efficiency is not indicative of independence and nonemployee status."). Generally, we look for some unique skill set, *see Carrell*, 998 F.2d at 333 (noting that "[p]ipe welding, unlike other types of welding, requires specialized skills"), or some ability to exercise significant initiative within the business, *see Hickey*, 699 F.2d at 752 (noting that the plaintiff-salesman controlled "major components" of the business open to initiative, including advertising, marketing, and the choice of other products to sell).  Here, Cornerstone argues that the Sales Leaders required skill and initiative to successfully recruit, train, and motivate a team of sales agents.

Certainly, the Sales Leaders required a general set of skills to effectively manage their offices and teams. However, these are not specialized skills; they are abilities common to *all* effective managers. *See Pilgrim Equip.*, 527 F.2d at 1314 (suggesting that general skills, "such as business sense, salesmanship, personality and efficiency," are not relevant to the employee-status inquiry). Cornerstone's corporate representatives acknowledged that successful sales

leaders did not need any specific skill set. Furthermore, the Sales Leaders had little opportunity to exercise initiative within the business. "All major components open to initiative—advertising, pricing, and most importantly the choice of [insurance-policy providers] with which to deal—are controlled by [Cornerstone]." *See Mr. W Fireworks*, 814 F.2d at 1053. Cornerstone also prevented the Sales Leaders from exercising true initiative in personnel issues, as Cornerstone controlled the ultimate hiring and firing and provided the Sales Leaders with company-approved recruitment ads. Accordingly, we conclude that the skill-and-initiative factor weighs strongly in favor of employee status.

### E.

Finally, we consider the permanency of the working relationship. *Mr. W Fireworks*, 814 F.2d at 1047. Most of the Sales Leaders worked for Cornerstone for many years. However, Cornerstone notes that the Sales Leaders' contracts provided for at-will termination, and argues that, as a result, this case is controlled by *Hickey*. In *Hickey*, we held that a salesman was an independent contractor to the gas-products manufacturer whose products he sold. 699 F.2d at 751–52. Although the salesmen had actually sold the manufacturer's products for ten years, we reasoned that the salesman was permitted to sell competitors' products and "was capable of terminating relations with [the manufacturer] upon 30 days notice and taking his business organization and talents to other manufacturers." *Id.* Cornerstone contends that *Hickey* requires us to give more weight to contractual language than to the actual length of the working relationship. However, such a rule would be contrary to our general approach to the economic-realities doctrine, *see, e.g., Mr. W Fireworks*, 814 F.2d at 1047 ("[I]t is not what the [parties] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive."), and at odds with our more recent applications of the permanency factor, *see, e.g., id.* at

1053–54 (discussing the actual length of the working relationship). We think *Hickey's* conclusion is best confined to the situation it was addressing—a nonexclusive business relationship between a supplier and a salesperson.

In this case, almost all of the Sales Leaders worked exclusively for Cornerstone for several years. Cornerstone's corporate representative acknowledged that sales leaders generally remained in their positions for "a significant period of time." Furthermore, unlike the salesman in *Hickey*, the Sales Leaders could not easily terminate the relationship and take their "business organization" elsewhere. *See Hickey*, 699 F.2d at 752. The foundation of the Sales Leaders' business organization—their team of subordinate salesmen—belonged exclusively to Cornerstone. As a matter of economic reality, the permanency factor weighs in favor of employee status for the Sales Leaders.

### F.

Because our factors are non-exhaustive, Cornerstone contends that certain other factors weigh in favor of independent-contractor status. Specifically, Cornerstone notes that the Sales Leaders contractually agreed to be, and actually believed themselves to be, independent contractors. While this may be accurate, "[s]ubjective beliefs cannot transmogrify objective economic realities. A person's subjective opinion that he is a businessman rather than an employee does not change his status." *Mr. W Fireworks*, 814 F.2d at 1049 (citations and internal quotations omitted). Furthermore, "facile labels . . . are only relevant to the extent that they mirror economic reality." *Id.* at 1044 (internal quotations omitted).

Cornerstone also contends that a finding of employee status will have a profound effect on the insurance industry, in which the use of independent contractors to sell policies is common. This concern is unfounded, as we deal

only with the management-level sales leaders in this case, not sales agents generally.

## G.

After reviewing the undisputed facts in light of our five factors, we are convinced that the district court correctly determined the Sales Leaders to be employees under the FLSA. As a matter of economic reality, the Sales Leaders were dependent upon Cornerstone to such an extent that they could not plausibly be considered "in business for [themselves]." *See Herman,* 161 F.3d at 303. The Sales Leaders worked exclusively for Cornerstone for significant periods of time and lacked the ability to exercise true initiative within the business model. Cornerstone controlled the geographic territories, the choice of products to sell, and the price of those products. Cornerstone unilaterally determined the number of sales leads the Sales Leaders could receive and effectively prevented the Sales Leaders from selling competing products or operating other businesses. Perhaps most importantly, Cornerstone controlled the foundation of the Sales Leaders' ultimate success—the hiring, firing, assignment, and promotion of the subordinate salespeople on whom the Sales Leaders relied. Given these facts, we conclude that the Sales Leaders were employees of Cornerstone as a matter of economic reality.

## III

The Sales Leaders contend that the district court erred in invoking judicial estoppel to dismiss Fox's claims on summary judgment. While a grant of summary judgment is generally reviewed *de novo*, we review the use of judicial estoppel only for abuse of discretion. *Kane v. Nat. Union Fire. Ins. Co.,* 535 F.3d 380, 384 (5th Cir. 2008). The abuse-of-discretion standard includes review of whether the court was guided by erroneous legal conclusions. *Id.*

No. 07-10952

Judicial estoppel is an equitable doctrine that "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (citations omitted). The purpose of the doctrine is to "protect[] the essential integrity of the judicial process" by reducing the "risk of inconsistent court determinations." *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001) (internal quotations omitted). Generally, we have recognized at least two requirements to invoke the doctrine: (1) the party's position must be clearly inconsistent with its previous one, and (2) the previous court must have accepted the party's earlier position. *Hall*, 327 F.3d at 396; *see also New Hampshire*, 532 U.S. at 750–51 (approving of the requirements in *Hall* as general factors rather than inflexible or exhaustive prerequisites).

Sales Leader Fox was previously sued for sexual harassment under the Texas Commission on Human Rights Act ("TCHRA"). *See* Tex. Lab. Code Ann. § 21.001 *et seq.* (Vernon 1996). As a defense to that action, Fox asserted in his pleadings and during his deposition that he was an independent contractor and thus outside scope of the TCHRA. The matter eventually settled before trial. In this case, the district court invoked judicial estoppel to prevent Fox from asserting his employee status under the FLSA. The court reasoned that Fox's prior defense in the TCHRA action was clearly inconsistent with his current claim, and that Fox intended for the previous court to accept his defense.

Fox contends that the district court erred in determining that his claim of employee status under the FLSA was "clearly inconsistent" with his earlier claim of independent-contractor status under the TCHRA. We agree.

Despite the semantic inconsistency, it is legally possible to be an employee for purposes of the FLSA and an independent contractor under most other statutes. *See Nationwide Mut.*, 503 U.S. at 326 (noting that the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such

12

under a strict application of traditional agency law principles"). The TCHRA, which was modeled after Title VII of the federal Civil Rights Act, uses a "hybrid economic realities/common law control test" to determine employee status. *Johnson v. Scott Fetzer Co.*, 124 S.W.3d 257, 263 (Tex. App.—Fort Worth 2003, pet. denied). Because this hybrid test focuses on traditional agency notions of control, it results in a narrower definition of employee than under a true economic-realities test. *See Deal v. State Farm County Mut. Ins. Co. of Texas*, 5 F.3d 117, 118–19 (5th Cir. 1993) (discussing the hybrid test); *Nationwide Mut.*, 503 U.S. at 326. Furthermore, it is clearly possible for Fox to be an employee under the FLSA even if he *actually believes* himself to be an independent contractor. As the court below acknowledged, "[a] person's subjective opinion that he is a businessman rather than an employee does not change his status" for purposes of the FLSA. *Mr. W Fireworks*, 814 F.2d at 1049. In sum, there is no legal inconsistency in claiming to be an employee under the FLSA and an independent contractor under the TCHRA.

While this conclusion may seem paradoxical, we are convinced that it is in line with the purposes of the doctrine. Judicial estoppel is designed to reduce "the risk of inconsistent court determinations." *New Hampshire*, 532 U.S. at 750–51. Because Fox's claim of employee status under the FLSA could not result in a *legally* inconsistent court determination, we conclude that the district court abused its discretion in applying judicial estoppel.[2]

---

[2] Although our analysis of the clearly-inconsistent requirement disposes of the current appeal, we note that the contours of our judicial-acceptance requirement are vague. In practice, we have required that the prior court *actually accept* the party's earlier position, "either as a preliminary matter or as part of a final disposition." *See, e.g., In re Superior Crewboats, Inc.*, 374 F.3d 330, 335 (5th Cir. 2004) (finding that the bankruptcy court accepted the party's previous position by issuing a "no asset" discharge). The Supreme Court appeared to approve of this actual-acceptance approach in *New Hampshire*. 532 U.S. at 750–51 ("Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity.") (internal citations and quotations omitted). On the other hand, *New Hampshire* did not purport to

No. 07-10952

## IV

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment on the employee status of the plaintiffs under the FLSA. We VACATE the district court's grant of summary judgment on the issue of judicial estoppel against Chris Fox, and REMAND for further proceedings consistent with this opinion.

---

establish "inflexible prerequisites," *id.* at 751, and we have at times implied a broader approach to our judicial-acceptance requirement, *see Hall*, 327 F.3d at 399. In *Hall*, we noted in dicta that "[o]ur cases suggest that [judicial estoppel] may be applied whenever a party makes an argument with the explicit intent to induce the district court's reliance." *Id.* In the present case, the district court apparently relied on this statement from *Hall* in applying judicial estoppel absent any indication that the prior court had accepted Fox's position. While we need not rule on the validity of this decision here, we note its potential inconsistency with our general approach and with the Supreme Court's analysis in *New Hampshire.* 532 U.S. at 750–51.